FILED

2022 Mar-18  PM 01:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| JIMMY BLAIN PETTUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-00915-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jimmy Blain Pettus appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for Supplemental Security Income (SSI), based on obesity, bipolar disorder, and lumbar degenerative disc disease.  Doc. 1.  Plaintiff Pettus applied for SSI, with an alleged onset date of June 1, 2016, and the Commissioner denied his claim.  Doc. 12-6 at 4; Doc. 12-3 at 1–7, 60–69.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties have consented to magistrate judge jurisdiction.  Doc. 11.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Pettus argues that the court should reverse the Commissioner's decision for three reasons:  (1) the Administrative Law Judge (ALJ) failed to give proper weight to the opinions of Pettus' treating physicians—Dr. Marilyn Lachman and Dr. Christopher Randolph—and failed to show good cause for finding those opinions unpersuasive; (2) the ALJ's decision was not supported by substantial evidence; and (3) the Appeals Council erred in declining to review a psychological evaluation and a mental health source statement from Dr. June Nichols that Pettus submitted.[1]  Doc. 14 at 2.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from

---

[1] For ease of review, the court presents these issues in a sequence that is different from Pettus' briefing.  Doc. 13; Doc. 16.

anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment, or combination of impairments, meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to

demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Commissioner of*

*Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (quotation marks and citation omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (similar).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Procedural background

On February 1, 2017, Plaintiff Pettus applied for Supplemental Security

Income (SSI) benefits.  Doc. 12-6 at 4.  In his application, Pettus alleged that he became disabled on June 1, 2016.  Doc. 12-6 at 4.

The SSA initially denied Pettus' claim on April 14, 2017.  Doc. 12-5 at 3–7.

The SSA granted Pettus' request for a hearing (Doc. 12-5 at 17–22); and on July 1, 2019, a hearing was held before an ALJ (Doc. 12-5 at 35–40; Doc. 12-3 at 60, 76–94).  A vocational expert or "VE"—Kathryn Dillon—appeared at the hearing and testified.  Doc. 12-3 at 60, 76, 88–93.

On August 27, 2019, the ALJ issued an unfavorable decision, finding that Pettus was not disabled, as defined by the Social Security Act.  Doc. 12-3 at 57–70. On October 25, 2019, Pettus appealed that decision through counsel.  Doc. 12-5 at 1, 68–70.

On May 26, 2020, the Appeals Council denied Pettus' request for review, and found that the ALJ "did not abuse his or her discretion" and that "none of the other reasons in [its] rules existed to review [Pettus'] case."  Doc. 12-3 at 2.

After the SSA Appeals Council denied Pettus' request for review of the ALJ's decision (Doc. 12-3 at 2–5), that decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

## B.    Factual background, and the ALJ hearing

Plaintiff Pettus was born on January 2, 1967, and was 52 years old at the time of the ALJ hearing.  Doc. 12-7 at 2; Doc. 12-3 at 81.  Pettus obtained his GED,

completed two years of college, and received a degree in welding in 1985.  Doc. 12-7 at 18; Doc. 12-3 at 81.  In the past, Pettus worked as a welder, forklift driver, safety guard, machinist helper, and construction worker.  Doc. 12-7 at 18, 24–28.

Pettus worked at the Anniston Army Depot for a number of years and served in Operation Desert Storm as a civilian employee.  Doc. 12-3 at 84.  Pettus worked as a welder at FabArc Steel for about a year, but quit that job because he felt that the company was planning to fire him.  Doc. 12-3 at 82.  He also worked as a machinist helper at Forte Power Supply.  Doc. 12-3 at 82–83.  He testified that the last job at which he had worked was welding for the bus industry.  Doc. 12-3 at 83.  Pettus testified at the ALJ hearing that he was unable to work because he felt like he would be a "harm to myself and others," and that when he gets around a crowd he "feel[s] like people [are] watching [him]."  Doc. 12-3 at 84.

In his initial application for SSI benefits, Pettus stated that he was homeless and lived in a tent in the woods.  Doc. 12-6 at 4; *see also* Doc. 12-7 at 32.  He stated that he did not have a permanent residence, but that he would visit his sister's home to eat and shower.  Doc. 12-6 at 5.  Pettus stated that he became disabled on June 1, 2016 (Doc. 12-6 at 4), and that he stopped working on August 31, 2015, because of his medical conditions of depression, bipolar disorder, anxiety, high blood pressure, and back problems (Doc. 12-7 at 17).

In a function report dated February 16, 2017, Pettus stated that he had trouble

7

remembering to take his medications and to take care of his personal needs and grooming.  Doc. 12-7 at 34.  He also stated that his sister helped him financially and with transportation to his doctor's appointments.  Doc. 12-7 at 36.  Pettus indicated that his condition affects his memory, concentration, understanding and ability to complete tasks and to follow instructions.  Doc. 12-7 at 37.  But Pettus stated that his ability to follow spoken instructions was "good."  Doc. 12-7 at 37.

Pettus' sister, Rebecca Strickland, submitted a third-party function report.  Doc. 12-7 at 40–47.  Strickland stated that, when Pettus stayed with her, "[h]e talk[ed] out of his mind," and that sometimes she did not "know what he [wa]s talking about."  Doc. 12-7 at 40.  Strickland stated that she had to make Pettus bathe and wash his hair, and that she had to remind him to take care of personal needs and grooming.  Doc. 12-7 at 41–42.  Strickland stated that Pettus lost interest in all hobbies because of his bipolar disorder.  Doc. 12-7 at 44.  Strickland stated that she and Pettus had an older sister, who also suffered from bipolar disorder and who had committed suicide.  Doc. 12-7 at 44–45.  Strickland stated that Pettus' condition affects the following:  lifting, squatting, bending, standing, kneeling, memory, completing tasks, concentration, understanding, and following directions.  Doc. 12-7 at 45.

At the ALJ hearing on July 1, 2019, Pettus testified that his sister "took me in because she saved my life."  Doc. 12-3 at 84.  Pettus testified that his sister paid for

his medical bills and one prescription.   Doc. 12-3 at 84.   Pettus had a mental breakdown in 2014, during which he ran around outside naked, and was talking about killing himself and his sister.   Doc. 12-3 at 85.   After that, Pettus' sister arranged for him to receive medical treatment from Quality of Life Health Services in Gadsden, Alabama ("Quality of Life").   Doc. 12-3 at 85.

The medical records indicate that Pettus received treatment from Quality of Life on a regular basis from August 2016 through at least August 2019.   *See* Doc. 12-8 at 1; Doc. 12-9 at 1; Doc. 12-10 at 1; Doc. 12-3 at 1.   Pettus' treatment at Quality of Life included therapy sessions with a Licensed Clinical Social Worker (LCSW), Chad Knight, and psychiatric treatment and medication management with Dr. Marilyn Lachman and Dr. Christopher Randolph.   *See* Doc. 12-8 at 23–111; Doc. 12-9.

In the ALJ hearing, Pettus testified that he takes medication for his bipolar disorder, schizophrenia, and the depression resulting from those conditions.   Doc. 12-3 at 85.

Pettus also testified that he had abused drugs in the past, before his diagnosis of bipolar disorder, in an attempt to self-medicate.   Doc. 12-3 at 83.

At the time of the ALJ hearing, Pettus stated that he spent a great deal of time in his bedroom, did not want to get out of bed, and even sometimes "hate[d] to take a shower."   Doc. 12-3 at 86.   He stated that he was not able to work because he

cannot concentrate, his memory is not good, and he hears voices that he feels like are talking about him.  Doc. 12-3 at 87.

As noted above, Kathryn Dillon, a vocational expert, also testified at the ALJ hearing.  Doc. 12-3 at 88–92.  Dillon described Pettus' past work as a welder as a medium, skilled job and his past work as a maintenance repairer helper as a heavy, skilled job.  Doc. 12-3 at 89.  Dillon testified that an individual with hypothetical limitations of simple work tasks and one-to-two step instructions could not perform Pettus' past jobs.  Doc. 12-3 at 91–92.

The ALJ posed hypotheticals to Dillon about an individual approaching advanced age, with Pettus' work history and educational background.  Doc. 12-3 at 89–92.  Based on a variety of additional limitations suggested by the ALJ, Dillon provided nine jobs in the national economy that such hypothetical individuals might be able to perform.  Doc. 12-3 at 89–92.  However, Dillon testified that, if a hypothetical individual could not have any contact with coworkers or supervisors, then the hypothetical individual could not perform the jobs that she previously had identified.  Doc. 12-3 at 92.  Dillon also testified that, if an individual were "absent in excess of one day a month on a chronic and consistent basis," then the individual "would not be able to maintain competitive employment."  Doc. 12-3 at 93.

C.    The ALJ's decision

On August 27, 2019, the ALJ issued an unfavorable decision on Pettus' SSI

claim.  Doc. 12-3 at 60–70.  At step two of the sequential analysis, the ALJ found that Pettus had severe impairments of obesity, bipolar disorder, and lumbar degenerative disc disease.  Doc. 12-3 at 62.  At step three, the ALJ found that Pettus did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments"—including "Listing 1.04," "Listing 12.04," and "Listing 12.06."  Doc. 12-3 at 62–65.  And, at step four, the ALJ concluded that Pettus was unable to perform his past work as a welder or maintenance repair[er] helper.  Doc. 12-3 at 68.

The ALJ found that Pettus was an individual closely approaching advanced age, because he was 50 years old when he filed his SSI application.  Doc. 12-3 at 68.  And, after considering Pettus' "residual functional capacity" (RFC), the ALJ found that there were medium, unskilled jobs in the national economy that Pettus could perform.  Doc. 12-3 at 69.  Consequently, the ALJ determined that Pettus was not disabled under the Social Security Act.  Doc. 12-3 at 70.

### D.    Appeals Council decision

Pettus requested that the SSA Appeals Council review the ALJ's decision.  Doc. 12-3 at 2–8.  In connection with his request for review, Pettus submitted—as "new evidence" for consideration—treatment notes from Quality of Life, a psychological evaluation from Dr. June Nichols, and a mental health source statement from Dr. Nichols.  The Appeals Council did not exhibit those records,

11

finding that Dr. Nichols' mental health source statement and some of the Quality of Life records would not have changed the outcome of the decision, and finding that the other Quality of Life records and Dr. Nichols' psychological evaluation did "not relate to the period at issue."  Doc. 12-3 at 3.

Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on the proper legal standards, and that the Appeals Council did not err in its decision to deny review.

## I.    The ALJ did not err in finding unpersuasive the opinions of Plaintiff Pettus' treating physicians, Dr. Marilyn Lachman and Dr. Christopher Randolph.

The ALJ did not err in finding unpersuasive the opinions of Plaintiff Pettus' treating psychiatrists—Dr. Marilyn Lachman and Dr. Christopher Randolph, both from Quality of Life Health Services.  Pettus argues that the two psychiatrists who treated him at Quality of Life opined that he had limitations that precluded him from employment, and that he was "substantially debilitated by psychiatric symptoms." Doc. 14 at 22, 24.  Pettus argues that those opinions were well supported by the record, and that in the Eleventh Circuit the opinion of a treating physician must be

given substantial or considerable weight unless good cause is shown to the contrary. Doc. 14 at 25–26; *see, e.g.*, *Winschel*, 631 F.3d at 1179.

With respect to the controlling legal standard, and for an application filed before March 27, 2017 (like the application in this case), an ALJ is required to give the opinion of a claimant's treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation marks and citation omitted).

The "good cause" required to discount a treating physician's opinion exists under the following circumstances:  (1) the "treating physician's opinion was not bolstered by the evidence"; (2) the "evidence supported a contrary finding"; or (3) the "treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation marks omitted).[2]

---

[2] Revised Social Security regulations—which were published on January 18, 2017, and which became effective on March 27, 2017—eliminated this so-called "treating physician rule."  *See* 20 C.F.R. §§ 404.1520c, 416.920c (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."); *Planas v. Commissioner of Soc. Sec.*, 842 F. App'x 495, 497 n.1 (11th Cir. 2021) ("For claims filed on or after March 27, 2017, . . . no significant weight is given to statements made by treating physicians as opposed to non-treating medical sources.")  But, because Pettus filed his application for SSI benefits on February 1, 2017 (i.e., before the effective date of those new regulations), the court applies the Eleventh Circuit's treating physician rule.  In addition, Pettus submitted a supplemental brief arguing that the court should consider a recent Eleventh Circuit decision, *Simon v. Commissioner*, 7 F.4th 1094 (11th Cir. 2021), on the issue whether the ALJ erred in discounting the opinions of his treating

Likewise, under the Social Security regulation for an application filed before March 27, 2017, if "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," then that opinion "will [be given] controlling weight." 20 C.F.R. § 416.927(c)(2).

Furthermore, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must assess the claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1546(c). And the court analyzes only whether the ALJ's RFC determination was supported by substantial evidence; the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer*, 395 F.3d at 1210.

---

physicians. Doc. 20. But this case is distinguishable from *Simon* because, as discussed above, the ALJ here demonstrated "good cause" for discounting the opinions of Pettus' treating physicians.

In this case, the ALJ found unpersuasive the opinions of Pettus' treating physicians—Dr. Lachman and Dr. Randolph.  Substantial evidence supported those findings, and so the ALJ had "good cause" not to give those opinions considerable weight.

### A.    Dr. Lachman

Pettus participated in an initial evaluation with Dr. Lachman at Quality of Life on March 6, 2017.  Doc. 12-8 at 93–96.  During that examination, Pettus reported anxiety, nervousness, racing thoughts, and forgetting his name in the grocery store. Doc. 12-8 at 93.  Dr. Lachman noted that Pettus had fears that the world will run out of food, and that Pettus thought "rocks on the ground look like heads."  Doc. 12-8 at 93.  The evaluation notes also indicated that Pettus admitted to using methamphetamine "on and off" from 2004 to 2012.  Doc. 12-8 at 94.

Dr. Lachman wrote, "[a]fter evaluation today in my office, Mr. Jimmy Blain Pettus clearly is unsafe in any workplace.  He lacks the persistence, concentration and pace to safely function in the workplace.  His symptoms worsened with time, untreated, and he needs now to focus on his health in order to be stable in the community."  Doc. 12-8 at 95.  Dr. Lachman also noted that Pettus had experienced "religious delusions" and had audiovisual hallucinations.  Doc. 12-8 at 96.

On April 30, 2018, Dr. Lachman also completed a medical source statement ("Mental Residual Functional Capacity Assessment"), opining that Pettus was

"markedly limited" in every area of mental functioning, including understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Doc. 12-10 at 35–37.  Dr. Lachman noted in the comments section that Pettus "lacks concentration, persistence, and pace to safely [function] in the workplace."  Doc. 12-10 at 37.

Nevertheless, in determining Pettus' RFC, the ALJ found "Dr. Lachman's assessment of [Pettus'] limitations unpersuasive."  Doc. 12-3 at 66.  First, the ALJ found that Dr. Lachman "relied heavily on [Pettus'] own description of his symptoms, almost none of which [Pettus had] included" in his February 16, 2017 function report (Exhibit 7E), which Pettus had "completed less than a month before his initial visit" with Dr. Lachman.  Doc. 12-3 at 66; *see also* Doc. 12-7 at 32–39.

The ALJ also found that Dr. Lachman's opinions were contradicted by the treatment notes from Chad Knight, the Licensed Clinical Social Worker (LCSW) at Quality of Life who had referred Pettus to Dr. Lachman.  Doc. 12-3 at 66.  Among other things, Knight noted that Pettus had an "impaired ability to make reasonable decisions," but that this impairment was "mild."  Doc. 12-8 at 64.  The ALJ found that Knight's "mental status findings indicate some psychological symptoms and limitations but reflect a considerably higher level of functioning than Dr. Lachman indicated in the notes from her March 2017 psychiatric evaluation and her April 2018 medical source statement."  Doc. 12-3 at 66.

Next, the ALJ addressed Dr. Lachman's notes from a counseling session on August 31, 2017, which indicated that Pettus was "relatively stable and able to cope with stressors . . . in a rational and logical manner." Doc. 12-3 at 66. The ALJ found that, in that counseling session, Pettus "reported that he was doing okay, stating that he still sometimes had 'visions,' but he . . . did not find [them] troubling." Doc. 12-3 at 66.

The ALJ found that, in a follow-up appointment with Dr. Lachman on December 11, 2017, Pettus "reported that he was doing better and was stable on his medications." Doc. 12-3 at 66 (citing Exhibit 5F); *see* Doc. 12-9 at 14.

The ALJ also noted that, on April 30, 2018, Pettus reported to Dr. Lachman that he was "doing well on his medications" and "thought he was doing better." Doc. 12-3 at 66; Doc. 12-9 at 48.[3] Further, the ALJ found that Pettus "did not see Dr. Lachman again after April 2018," and that Pettus' "records do not document another psychiatric visit until February 7, 2019," when he started treatment with Dr. Randolph. Doc. 12-3 at 66.

In sum, the ALJ found that Dr. Lachman's opinions were not consistent with Knight's treatment records and Dr. Lachman's own treatment records, and were not

---

[3] Here, the court must observe that Dr. Lachman's full notes from this visit state that Pettus "thinks he is doing better although he continues to have his spells," and that he "lacks the persistence, concentration and pace to safely function in the workplace." Doc. 12-9 at 48.

supported by the other record evidence. Doc. 12-3 at 66; *see* 20 C.F.R. § 416.927(c)(2) (for applications filed before March 27, 2017). Thus, the ALJ demonstrated "good cause" to discount Dr. Lachman's opinions because her opinions were not bolstered by other record evidence, including Pettus' own function report and Knight's treatment records, and because her opinions were inconsistent with her own treatment records. Doc. 12-3 at 66; *see Winschel*, 631 F.3d at 1179.

So long as the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529). Substantial evidence supported the ALJ's findings in this regard, and consequently the ALJ had good cause to discount Dr. Lachman's opinions.

### B.    Dr. Randolph

In February 2019, Pettus began receiving psychiatric treatment from Dr. Christopher Randolph at Quality of Life. On February 7, 2019, Dr. Randolph noted that Pettus was "unkempt," but that his cognition, insight, and judgment were "within normal limits." Doc. 12-9 at 117–18, 121. At that appointment, Pettus reported that he was "feeling fair." Doc. 12-9 at 117. On February 28, 2019, Pettus reported to Dr. Randolph that he was feeling "blah" and "about the same." Doc. 12-9 at 133. Based on an April 11, 2019 appointment, Dr. Randolph described Pettus' mood as depressed and his affect as constricted (Doc. 12-9 at 133), but his "mental

18

status findings were otherwise normal" (Doc. 12-3 at 67 (citing Exhibit 5F); *see* Doc. 12-9 at 133–34).

Dr. Randolph continued to treat Pettus and, on June 6, 2019, completed a medical source statement indicating that Pettus could not maintain attention, concentration and/or pace for at least two hours, could not sustain an ordinary work routine without special supervision, could not adjust to work changes, could not interact with supervisors and coworkers, and could not adhere to basic standards of neatness and cleanliness.  Doc. 12-10 at 70.  Dr. Randolph stated that Pettus "would be off task 100 percent of an eight-hour workday."  Doc. 12-3 at 67 (citing Exhibit 9F); *see* Doc. 12-10 at 70.

As with Dr. Lachman, the ALJ was "unpersuaded by the opinions offered by Dr. Randolph" because the "limitations Dr. Randolph indicated [we]re inconsistent with the conservative nature of [Pettus'] longitudinal mental health treatment history and with the relatively mild mental status exam findings noted by Dr. Randolph and other treatment providers."  Doc. 12-3 at 67.

In reaching the conclusion that Dr. Randolph's opinions were unpersuasive, the ALJ found that Dr. Randolph's treatment notes consistently described Pettus' appearance as normal, directly contradicting Dr. Randolph's conclusion that Pettus would be unable to meet basic standards of neatness and cleanliness.  Doc. 12-3 at 67 (citing Exhibit 2F); *see* Doc. 12-8 at 21–82.

The ALJ also found that Dr. Randolph's treatment records indicated that Pettus "consistently demonstrated a cooperative attitude," which contradicted Dr. Randolph's opinion that Pettus would be unable to interact with supervisors and coworkers. Doc. 12-3 at 67.

The ALJ found that the limitations described by Dr. Randolph "substantially exceed[ed]" the limitations Pettus himself had described in his February 16, 2017 function report. Doc. 12-3 at 67 (citing Exhibit 7E); *see* Doc. 12-7 at 32–39.

Furthermore, the ALJ found that Dr. Randolph's opinion that Pettus would be off-task for 100 percent of the workday "[wa]s at odds with the cognition [Pettus] exhibited at his office visits." Doc. 12-3 at 67 (citing Exhibit 5F); *see* Doc. 9.

Thus, the ALJ found that Dr. Randolph's opinions were not consistent with his own medical records, and were not supported by the other evidence. Doc. 12-3 at 66; *see* 20 C.F.R. § 416.927(c)(2) (for applications filed before March 27, 2017). As with Dr. Lachman, the ALJ found that Dr. Randolph's opinions were inconsistent with his own treatment records and were not bolstered by other record evidence, including Pettus' own function report. Because substantial evidence supported the ALJ's findings, the ALJ had the "good cause" necessary to discount Dr. Randolph's opinions. *See Winschel*, 631 F.3d at 1179.

## II.    Substantial evidence supported the ALJ's decision.

As explained above (*see* Part I *supra*), substantial evidence supported the

ALJ's decision.  Pettus asserts that the ALJ's "unfavorable decision [wa]s not based on substantial evidence," arguing only that the ALJ "disregarded the opinion of Dr. Lachman and Dr. Randol[ph] the treating psychiatrists and substituted his opinion for that of the treating psychiatrists."  Doc. 14 at 30.  Pettus' reply brief repeats that same argument.  Doc. 17 at 15.

In this regard, it is not clear that Pettus properly has raised any additional issue for review.[4]  Regardless, the ALJ had good cause to find that Dr. Lachman and Dr. Randolph's opinions were not persuasive, and substantial evidence supported the ALJ's conclusions.  *See supra* Part I.

### III.    The Appeals Council did not err in declining to review the psychological evaluation and the mental health source statement from Dr. June Nichols that Plaintiff Pettus submitted.

The SSA Appeals Council did not err in declining to review the psychological evaluation and the mental health source statement from Dr. June Nichols that Pettus submitted.  In this case, Pettus submitted to the Appeals Council the following "new evidence" for consideration:  treatment notes from Quality of Life; a psychological evaluation from Dr. Nichols; and a mental health source statement from Dr. Nichols.  In his appeal, Pettus argues only that the Appeals Council erred by not properly

---

[4] *See, e.g.*, *Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009) ("[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes [this court from] considering the issue on appeal."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (similar).

considering the records from Dr. Nichols. Specifically, Pettus argues that the Appeals Council erred in finding that the psychological evaluation from Dr. Nichols was not chronologically relevant (Doc. 14 at 2, 28–30), and that the mental health source statement from Dr. Nichols was not material (Doc. 19 at 3).

Generally, a claimant may present evidence at each stage of the SSA's administrative review process. *See Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1308–09 (11th Cir. 2018). If a claimant presents evidence after the ALJ's decision, the Appeals Council must consider whether the evidence is new, chronologically relevant, and material. *See id.* at 1309; 20 C.F.R. § 416.1470(a)(5).

Evidence is "chronologically relevant" if it "relates to the period on or before the ALJ's hearing decision." *Hargress*, 883 F.3d at 1309 (citations omitted). And evidence is "material" if there is a "reasonable possibility" that it "would change the administrative result." *Id.* (citation omitted).

If the ALJ's decision is contrary to the weight of the evidence, including the new evidence, then the Appeals Council must grant a claimant's petition for review. *Id.* But the Appeals Council is not required to provide a detailed rationale for denying review. *Mitchell v. Social Sec. Admin, Comm'r*, 771 F.3d 780, 784 (11th Cir. 2014).

Moreover, the court should affirm the Appeals Council's decision not to review new evidence, unless the new evidence is both chronologically relevant ***and***

22

material.  *See, e.g.*, *Raices v. Commissioner of Soc. Sec.*, 805 F. App'x 836, 837 (11th Cir. 2020).

Here, in January 2020 (approximately five months after the ALJ's decision), Dr. Nichols completed a psychological evaluation of Pettus.  Doc. 12-3 at 10–14. As part of that evaluation, Dr. Nichols reviewed Pettus' medical records, including many records that Pettus had submitted to the ALJ.  Doc. 12-3 at 10–12.  Dr. Nichols also completed a mental status examination, and found that Pettus had a depressed mood and sad affect.  Doc. 12-3 at 13.  But Dr. Nichols noted that Pettus "was oriented to time, place, and situation," and that his "[t]hought processes were within normal limits."  Doc. 12-3 at 13.  Dr. Nichols ultimately concluded that Pettus was "unable to deal with the normal pressures in a competitive work setting."  Doc. 12-3 at 14.[5]

On January 22, 2020 (a few weeks after the psychological evaluation), Dr. Nichols completed a one-page mental health source statement for Pettus.  Doc. 12-3 at 9.  Dr. Nichols indicated on that form that, due to Pettus' psychological symptoms, she would expect him to be off task 95% of the time during an 8-hour workday, and that she would expect him to miss work 25 days out of a 30-day work

---

[5] In addition to the mental health records from Dr. Nichols, Pettus submitted medical records from Quality of Life.  On appeal, Pettus does not make any argument regarding the Appeals Council's decision not to exhibit the Quality of Life medical records.  Consequently, the court addresses only Dr. Nichols' records.

period.  Doc. 12-3 at 9.

The Appeals Council found that Dr. Nichols' five-page psychological evaluation was not chronologically relevant.  Doc. 12-3 at 3 ("This additional evidence does not relate to the period at issue.").  And the Appeals Council found that Dr. Nichols' mental health source statement was not material.  Doc. 12-3 at 3 ("[T]his evidence does not show a reasonable probability that it would change the outcome of the decision.").

Relying on *Washington v. Commissioner*, 806 F.3d 1317 (11th Cir. 2015), Pettus argues that Dr. Nichols' records are chronologically relevant, even though they are dated after the ALJ's decision.  *See Washington*, 806 F.3d at 1322–23 (recognizing that medical opinions issued after the ALJ's decision may be chronologically relevant if the opinions are based on medical records from the period before the ALJ's decision).

Ultimately, the court need not decide whether Dr. Nichols' psychological evaluation or mental health source statement is chronologically relevant, because those records still are not material.  *See, e.g.*, *Raices*, 805 F. App'x at 837.  With respect to chronological relevance, the court does observe that Dr. Nichols' psychological evaluation may be chronologically relevant, in large part because Dr. Nichols reviewed materials much like those that the consultative examiner

considered in the *Washington* case.[6]

Regardless, with respect to materiality, it is not clear that Pettus properly has raised any issue for review. *See, e.g.*, *Singh*, 561 F.3d at 1278–79; *Sapuppo*, 739 F.3d at 681. Each of Pettus' three briefs arguing that the Appeals Council erred just cites the legal standard for materiality and then summarily states that Dr. Nichols' "evaluation" meets that legal standard. Doc. 14 at 29–30; Doc. 17 at 12–15; Doc. 19 at 7–8.[7] Pettus does not explain how or why Dr. Nichols' psychological evaluation or mental health source statement would "change the administrative result." *See Hargress*, 883 F.3d at 1309.

---

[6] *See Hargress*, 883 F.3d at 1309 (explaining that the court in *Washington* found a psychologist's medical records "were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision" (citing *Washington* 806 F.3d at 1319, 1322–23)).

[7] Pettus submitted a second supplemental brief, arguing that the court should consider a recent Eleventh Circuit decision about the Appeals Council's analysis of newly submitted evidence—that is, *Pupo v. Commissioner*, 17 F.4th 1054 (11th Cir. 2021). Doc. 19. But, in *Pupo*, the Eleventh Circuit concluded that two of the ALJ's factual findings "appear[ed] to be inaccurate" based on the new medical records that the claimant had submitted to the Appeals Council. *Pupo*, 17 F.4th at 1063. As a result, the Eleventh Circuit held that the Appeals Council erred in determining that the new evidence "failed to show a reasonable probability of a different outcome." *Id.* at 1064 (citation omitted). Here, unlike the new evidence in *Pupo*, neither Dr. Nichols' psychological evaluation nor her mental health source statement contradicted any of the ALJ's factual findings, and the new evidence that Pettus submitted was not material.

In any event, Dr. Nichols' medical records are not material.  *See Hargress*, 883 F.3d at 1309.  As explained above (*see* Part I *supra*), the ALJ properly discounted similar evaluations from Pettus' treating psychiatrists, Dr. Lachman and Dr. Randolph.  And, as with the opinions from Dr. Lachman and Dr. Randolph, the extreme limitations that Dr. Nichols noted in her psychological evaluation and in her mental health source statement also are contradicted by other record evidence.  *See Hargress*, 883 F.3d at 1310 (finding immaterial a physical capacities form that was contradicted by the doctor's own medical records and other objective medical evidence).  Plus, Dr. Nichols' mental health source statement would have been entitled to little weight because it was only a one-page, conclusory checklist.[8]

Accordingly, Pettus has not shown a "reasonable possibility"[9] that Dr.

_____

[8] *See, e.g.*, 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.  The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

[9] In addressing the Quality of Life medical records and Dr. Nichols' mental health source statement, the Appeals Council found that the "evidence does not show a reasonable *probability* that it would change the outcome of the decision."  Doc. 12-3 at 3 (emphasis added).  In the past, the Eleventh Circuit has applied a reasonable *possibility* standard to determine whether new evidence is material. *See Hargress,* 883 F.3d at 1309.  However, the SSA's current regulations—which were in effect at the time of the Appeals Council's decision in this case—state that the Appeals Council will grant a request for review based on additional evidence only if "there is a reasonable *probability* that the additional evidence would change the outcome of the decision."  20 C.F.R. § 404.970(a)(5) (emphasis added).  Here, the Appeals Council denied Pettus' request for review in May 2020, after those regulations took

Nichols' psychological evaluation or mental health source statement "would change the administrative result."  *See Hargress*, 883 F.3d at 1309.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final judgment.

**DONE** and **ORDERED** this March 18, 2022.

_____

**NICHOLAS A. DANELLA**
**UNITED STATES MAGISTRATE JUDGE**

---

effect in May 2017.  *See* Doc. 12-3 at 2 ("We applied the laws, regulations and rulings in effect as of the date we took this action.").  Consequently, the Appeals Council correctly applied the reasonable probability standard to the new evidence that Pettus submitted.  *See, e.g.*, *Clark v. Social Sec. Admin., Comm'r*, 848 F. App'x 858, 862 (11th Cir. 2021) (rejecting the plaintiff's argument that the Appeals Council erred because it applied the materiality standard of "reasonable probability" rather than "reasonable possibility," in part because "[t]he Appeals Council denied review of [the plaintiff's] claim after those regulations became effective").